UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CIANBRO COMPANIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12-CV-00330-DBH |
| | ) | |
| MICHAEL UREMOVICH, et als., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION
AND
ORDER DENYING ORAL ARGUMENT**

On October 26, 2012, Cianbro Companies filed suit against Michael Uremovich, Great

Lakes Energy Consulting LLC, and Manhattan Mechanical Services LLC, seeking, *inter alia*, to

enforce a non-competition and non-disclosure agreement Uremovich executed in connection

with the 2010 sale of Starcon International to Cianbro.  In combination with its complaint,

Cianbro filed a motion for preliminary injunction (ECF No. 4).  In a conference concerning the

plaintiff's motion for an expedited briefing schedule, defense counsel indicated that the

defendants intended to file a motion to dismiss.  I ordered that the defendants file a combined

motion to dismiss and "preliminary" response to the motion for preliminary injunction and that

the plaintiffs combine the briefing of their reply in support of the preliminary injunction motion

and their response to the motion to dismiss.  (Nov. 6, 2012, Report and Order, ECF No. 23.)  In

the report and order, I charted the following provisional course, in the event the motion to

dismiss is denied:

> In the event the dispositive motion filed by defendants is denied, a full,
> supplemental response to the Motion for Preliminary Injunction will be due seven
> days following ruling on the dispositive motion.  This supplementation should

> contain all additional legal argument and affidavits defendants wish to present.
> Plaintiff will then have the normal reply time and this matter is then to be set for
> hearing.  No discovery in connection with the motion for preliminary injunction is
> deemed necessary by either side at this point in time.  Should that situation
> change the parties will contact me regarding any scheduling modifications.

(Id. at 2.)  On January 18, 2012, the court referred the motion to dismiss (ECF No. 26) for report

and recommendation.  The court also referred the defendants' motion for oral argument (ECF

No. 31).  For reasons that follow, I recommend that the court grant the motion to dismiss solely

with respect to the claim for tortious interference set forth in count V.  The defendants' request

for oral argument is denied in the context of the referral, but the defendants or the plaintiffs may

request oral argument in the context of any objection to this recommended decision.

### THE ALLEGATIONS

A motion to dismiss for failure to state a claim is ordinarily evaluated in light of the

allegations contained within the four corners of the plaintiff's complaint.  Young v. Lepone, 305

F.3d 1, 10-11 (1st Cir. 2012).  However:  "When the factual allegations of a complaint revolve

around a document whose authenticity is unchallenged, 'that document effectively merges into

the pleadings and the trial court can review it in deciding a motion to dismiss under Rule

12(b)(6).'"  Id. at 11 (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir.

1998)).  Here, the pleading under review consists of the plaintiff's complaint, which is based in

part on the provisions of a non-competition and non-disclosure agreement.  It is apparent from

the parties' briefs that the agreement's authenticity is not subject to dispute.  Therefore, the

following recitation includes both the material allegations found within the four corners of the

plaintiff's complaint and the material provisions of the agreement.  For purposes of the motion to

dismiss, all of the plaintiff's allegations are treated as true.  Eldredge v. Town of Falmouth, 662

F.3d 100, 104 (1st Cir. 2011).

Plaintiff Cianbro Companies is a Maine corporation that provides civil, structural, mechanical, electrical, instrumentation, fabrication, and coating services, in markets throughout the United States. Defendant Michael Uremovich is an Illinois resident. Defendant Manhattan Mechanical Services is an Illinois limited liability company. Defendant Great Lakes Energy Consultants is an Illinois limited liability company. Uremovich is the sole member of both Manhattan Mechanical Services and Great Lakes Energy. (Complaint ¶¶ 1-6.)

**Sale of Starcon and Execution of the Agreement**

In 1983, Uremovich founded Starcon International, Inc., which provides services to petrochemical companies and refineries in the Midwest, Gulf Coast, and West Coast. Its services include capital construction, plant maintenance, turnaround execution, project management, specialty welding, boilermaker work, millwright work, equipment operation, pipe fitting, insulation, and scaffolding. (Id. ¶ 10.) On November 5, 2010, Cianbro entered into a stock purchase agreement with the shareholders of Starcon, including Uremovich, and purchased 100% of Starcon's outstanding shares. (Id. ¶ 9.) In discussions leading up to the sale, Uremovich described Starcon's business as providing services to refineries and petrochemical companies and included all of Starcon's customers in his description of the business. (Id. ¶ 12.) In conjunction with Cianbro's purchase of Starcon, Cianbro and Starcon collectively prepared a "road show" to present Cianbro's acquisition to Starcon's and Cianbro's customers. The presentation included the message that Cianbro's acquisition of Starcon would allow "Cianbro to penetrate the refining and petrochemical industry." (Id. ¶ 13.) Among Starcon's existing customers were Corn Products / Ingredion, ExxonMobil, Rhodia, Marathon Petroleum, and Lyondell Basell, all of which were disclosed to Cianbro in connection with the sale. (Id. ¶¶ 13, 17-19.)

3

At the time of the Starcon sale, Uremovich held a majority of Starcon's stock shares and he received in excess of $4.5 million for his shares.  (Id. ¶ 14.)  The stock purchase agreement required that Uremovich deliver prior to closing an executed non-competition agreement.  (Id. ¶ 16.)  On November 5, 2010, Uremovich entered into the Non-Competition and Non-Disclosure Agreement (the "Agreement") that now forms the basis of this litigation.  (Id. ¶ 20.)  In two preliminary recitals, the Agreement stated that Uremovich "has been actively engaged in [Starcon's] business and has had substantial contact with confidential information of the Company, including customer lists, proprietary business practices, marketing and pricing practices and the like" and indicated that the stock purchase agreement required Uremovich to execute the Agreement.  (Id. ¶¶ 21.)  Thereafter, the Agreement sets forth the non-compete and non-disclosure covenants, as follows:

> 1. Non-Compete.    Seller covenants and agrees that, in order to protect the Company's interest in the Business and Cianbro's interest in the Company, Seller will not, for a period of thirty six (36) months following the closing of the Transaction (the "Restricted Period") engage or participate, directly or indirectly, passively or actively, anywhere in the 48 contiguous United States (the "Geographic Area"), as an owner, partner, shareholder, employee, director, officer, investor, lender, agent, representative, manager or otherwise, in any business that provides services or products, including patented or other copyrighted processes, to refineries and petrochemical facilities (a "Competing Business"), except that (i) Seller shall be permitted to be involved with, work for or be employed by one or more staffing companies that provide personnel to a Competing Business provided that the Seller activities are limited to only training craft personnel in connection with such staffing companies, and (ii) Seller shall be able to provide equipment and crane rental products and services to a Competing Business.  For purposes of clarity, in addition to the exceptions above, Seller shall be permitted to engage in any activities related to all other types of facilities and industries.

(Id. ¶ 22;  Complaint Ex. 1, Agreement ¶ 1, ECF No. 1-1.)[1]

---

[1]     With respect to the covenant not to compete, Cianbro alleges that "senior management at Starcon" understood the phrase "refineries and petrochemical facilities" to be a reference for the types of facilities and customers Starcon had at the time of the sale and understood that the purpose of the Agreement was to allow Starcon

    2.  <u>Non-Disclosure.</u>    Seller further agrees that all Confidential Information of the Company to which he has had access is valuable to the Company and the sole and exclusive property of the Company.  Seller agrees that he will not, without prior written authorization from the Company, publish or make available any such Confidential Information to any person or entity.  For purposes of this Agreement, "Confidential Information" shall mean any information or material, whether written, oral or visual, without respect to the Company that is of a confidential or proprietary nature, including, without limitation, ownership information, financial information, regulatory information, customer or supplier information, operational information, pricing information, or any information that may be generated or derived therefrom . . . .

(Complaint ¶¶ 24-25;  Agreement ¶ 2.)  In addition to these covenants, the Agreement contained

a remedies provision that included the following language:

    4.  <u>Remedies.</u>    Seller recognizes and agrees that any violation of the covenants and agreements contained in paragraphs 1, 2 and 3 above will cause irreparable and continuing damage or injury to the company, the exact amount of which would be difficult to ascertain and for which there may be no adequate remedy at law, and that, for such reasons, among others, [Starcon] and Cianbro shall be entitled, as a matter of course, to request an injunction from any court of competent jurisdiction restraining any further violation as well as recovery from Seller of any and all costs and expenses sustained or incurred by [Starcon] or Cianbro in successfully obtaining such an injunction, including without limitation reasonable attorneys fees."

(Complaint ¶ 26;  Agreement ¶ 4.)  Lastly, the complaint incorporates paragraph 5 of the

Agreement, which expressed the Seller's recognition that the Agreement's "territorial, time and

scope limitations . . . are reasonable and are required for the protection of the Company being

purchased and shall not prevent Seller from earning a living."  (Complaint ¶ 27;  Agreement ¶ 5.)

**The Alleged Breaches**

    On October 22, 2010, two weeks before signing the Agreement, Uremovich registered

both Great Lakes Energy Consultants and Manhattan Mechanical Services.  According to

Cianbro, Great Lakes Energy has engaged in marketing efforts targeted at the petrochemical

---

a period of repose following Uremovich's departure so that others could develop their own relationships with Starcon's customers without interference from Uremovich.  (Complaint ¶ 23.)

industry since its inception.  Cianbro states that Great Lakes Energy has had only one employee, Uremovich, who is also its sole principal and manager, and that Manhattan Mechanical employs Uremovich as its manager and chief executive officer.  (Complaint ¶¶ 29-30.)

Attached to the complaint is a print version of a page from Manhattan Mechanical's website, which describes that LLC's services to include "process piping, structural steel, equipment setting, scaffolding, and insulation for heavy industrial facilities."  The webpage also indicates that Manhattan Mechanical "provides safe, highly skilled merit shop craftsmen to: [among others] [e]thanol plants . . ."  (Id. ¶¶ 31-32;  Complaint Ex. 4, Webpage, ECF No. 1-4.)

According to the complaint, Uremovich has solicited customers of Starcon in the petrochemical industry and at refineries and has engaged in other marketing efforts targeted at petrochemical companies and refineries on behalf of both Great Lakes Energy and Manhattan Mechanical Services.  (Complaint ¶ 34.)

**Stepan Chemical**

Cianbro states that Manhattan Mechanical Services has provided construction services for a turn-around project at Stepan Chemical, a current Starcon customer and "petrochemical business," in Joliet, Illinois.  (Id. ¶ 35.)  Cianbro describes Stepan as a manufacturer of basic and intermediate chemicals including petroleum-based polymers and oil field chemicals for drilling, production and stimulation of oil production.  (Id. ¶ 36.)  This turn-around project is "the exact type of work Starcon does."  (Id. ¶ 37.)

**Rhodia**

Cianbro describes Rhodia as a provider of sulfuric acid and sulfuric acid regeneration technology to refineries and to manufacturers of high performance products in the petrochemical industry.  Rhodia is currently a Starcon customer and was listed as a Starcon "material customer"

6

in the stock purchase agreement.  (Id. ¶¶ 19, 38.)  Cianbro states that Uremovich "approached" Rhodia by telephoning its procurement manager and requesting that Manhattan Mechanical Services be considered for any future work at Rhodia's Richton Park, Illinois location. Uremovich has represented to Rhodia that Rhodia is not covered by the Agreement.  (Id. ¶ 39.)

### Ingredion (Corn Products)

Cianbro alleges that Uremovich has sought to establish a business relationship with Ingredion (formerly known as Corn Products).  (Id. ¶ 40.)  Cianbro describes Ingredion as a refiner of corn, tapioca, wheat, potatoes and other raw materials for the manufacture of food, beverage, brewing and pharmaceutical industries as well as numerous industrial sectors.  Starcon currently provides construction services at Ingredion that are identical to the services Manhattan Mechanical currently advertises on its website.  (Id. ¶ 41.)  According to Cianbro, Uremovich's assistant at Manhattan Mechanical contacted the superintendent at Ingredion's Westchester facility for the purpose of setting up a meeting to discuss the services that Great Lakes Energy could provide to Ingredion in competition with Starcon.  (Id. ¶ 42.)  Corn Products was an existing customer of Starcon with a "prime contract" when Uremovich executed the Agreement. (Id. ¶ 18.)

### Marathon Petroleum

Cianbro describes Marathon as a Starcon customer and a key player in the oil refining industry operating six refineries in the Midwest and Southeast United States.  (Id. ¶ 44.) According to the complaint, on July 10, 2012, Uremovich telephoned a current Starcon employee and informed him that he had recently spoken with the maintenance manager for Marathon's facility in Catlettsburg, Kentucky about securing future work for Manhattan Mechanical at the facility.  (Id. ¶ 45.)  Additionally, during the week of July 16, 2012, Uremovich attended the

7

Marathon Oil golf outing in Findley, Ohio, and had Manhattan Mechanical Services listed as a platinum sponsor for the event.  Multiple representatives from Marathon's refineries and companies involved with the petrochemical industry were in attendance at the Marathon Oil golf outing.  (Id. ¶ 46.)  Marathon Oil was an existing "material customer" of Starcon when Uremovich executed the Agreement.  (Id. ¶ 19.)

Following additional allegations describing the "irreparable harm" it has suffered, Cianbro recites five counts, or causes of action:  (1) breach of the non-compete provision of the Agreement, against Uremovich;  (2)  breach of the non-disclosure provision of the Agreement, against Uremovich;  (3)  violation of Maine's Uniform Trade Secrets Act, against all three defendants;  (4) a request for attorneys' fees under the Trade Secrets Act;  and (5) tortious interference against Great Lakes Energy and Manhattan Mechanical Services.  Additional claim-specific allegations are related in the discussion to the extent necessary to resolve the motion to dismiss.

### SUMMARY DISMISSAL STANDARDS

When deciding a motion to dismiss brought pursuant to Rule 12(b)(6), the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a claim for recovery that is "plausible on its face."  Eldredge v. Town of Falmouth, 662 F.3d 100, 104 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).  "A claim is facially plausible if it is supported by 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Iqbal, 129 S. Ct. at 1949).  A plaintiff's complaint need not provide an exhaustive factual account, only "a short and plain statement."  Fed. R. Civ. P. 8(a).  However,

the allegations must be sufficient to identify the manner by which the defendant subjected the

plaintiff to harm and the harm alleged must be one for which the law affords a remedy.  Iqbal,

129 S. Ct. at 1949.

DISCUSSION

According to the defendants (hereafter "Uremovich," unless otherwise indicated), the

complaint fails to allege a single violation of the Agreement.  (Motion to Dismiss at 1, ECF No.

26.)  Uremovich maintains that this civil action is really designed to "extend" the Agreement "far

beyond" its terms to "eliminate fair competition" permitted under the Agreement.  (Id. at 2.)  As

for the non-contract claims, Uremovich asserts that the allegations are conclusory in nature and

therefore fail to state a claim.  (Id.)  For reasons discussed below, Uremovich's motion to dismiss

should be denied, except as to the tortious interference claim in count V.

**A.      The Contract Claims**

   **1.      *Rules of construction***

The Agreement contains a choice of law provision, which stipulates that Maine law "will

govern all questions concerning the construction, validity and interpretation of this Agreement

and the performance of the obligations imposed by this Agreement."  (Agreement ¶ 7.)  Maine

law provides that a court may construe the language of a contract "as a matter of law," if the

court determines that the contract language is unambiguous.  Am. Prot. Ins. Co. v. Acadia Ins.

Co., 2003 ME 6, ¶ 11, 814 A.2d 989, 993.  However, if the language is ambiguous, then the job

of interpreting it is assigned to the finder of fact and the finder of fact assesses the question based

on the intention of the parties.  Id.  Whether the language at issue is ambiguous is a question of

law for the court.  OfficeMax Inc. v. Sousa, 773 F. Supp. 2d 190, 215 (D. Me. 2011) (citing

United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995)).  The mere fact that the

9

parties disagree about the meaning of the agreement does not necessarily mean it is ambiguous." Champagne v. Victory Homes, Inc., 2006 ME 58, 897 A.2d 803, 806 (Me. 2006).

"In most cases, where contractual language has a plain, generally accepted meaning, it should be interpreted in accordance with that meaning." OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011) (citing Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp., 2005 ME 29, 868 A.2d 220, 228 (Me. 2005)). But if the language can be understood in two or more ways, each of which is reasonable, then it is ambiguous. Id. (citing Coastal Ventures v. Alsham Plaza, LLC, 2010 ME 63, ¶ 26, 1 A.3d 416, 424). Disputes over ambiguous contract provisions are amenable to proof by extrinsic evidence and should be resolved by a fact finder unless the extrinsic evidence demonstrates that the parties are in agreement concerning their mutual intent, id., or that the issue is "so one-sided that no reasonable person could decide the contrary," Michael v. Liberty, 547 F. Supp. 2d 43, 49 (D. Me. 2008) (quoting Boston Five Cents Sav. Bank v. Sec'y of Dep't of Housing & Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985)).

Uremovich argues that the rules of construction are modified here because he was the equivalent of an employee presented with a one-sided employment contract and, therefore, any ambiguity in the non-compete provision must be construed in his favor and against the employer who presumably drafted the Agreement. (Motion to Dismiss at 7.) However, Cianbro was not Uremovich's employer. Cianbro purchased Uremovich's shares of stock in an arm's length business transaction between two sophisticated parties. The terms of that transaction were the product of a bargain and were not dictated by Cianbro. This case therefore falls outside of the rule that construes ambiguities against the employer who drafted them. Compare, e.g., Lanier Professional Servs. v. Ricci, 192 F.3d 1, 5 (1st Cir. 1999) (affirming trial court's decision to construe an ambiguous contract term against the employer/drafter where extrinsic evidence did

10

not resolve the issue);  cf. Portland Valve, Inc. v. Rockwood Systems Corp., 460 A.2d 1383,

1388 (Me. 1983) ("[C]ourts should not rewrite contracts, particularly agreements between two

corporations acting at arms length.").

## 2.      *The non-compete provision*

The Agreement's non-compete provision appears to be straight-forward.  Bypassing

immaterial phrases, Uremovich agreed that, for 36 months, he would not:  "engage or participate,

directly or indirectly, passively or actively, . . . as an owner, partner, shareholder, employee,

director, officer, . . . agent, representative, manager or otherwise, in any business that provides

services or products . . . to refineries and petrochemical facilities (a "Competing Business") . . ."

(Agreement ¶ 1.)  Two exceptions to this covenant are not relevant to the instant dispute.  A third

exception is meant to provide "clarity" and states that Uremovich "shall be permitted to engage

in any activities related to all other types of facilities and industries."

The plain language is unambiguous in most respects.  It unambiguously states that

Uremovich may not engage or participate in a business if it provides services or products to

refineries and petrochemical facilities.  This restriction is unambiguously facility-specific, not

company-specific.  For example, the restriction does not extend to a particular "facility" if the

facility is neither a refinery nor a "petrochemical facility," even if the company that owns the

facility is in the business of operating refineries and petrochemical facilities.  However, the third

exception, though meant to provide clarity, introduces some ambiguity with its use of the term

"industries."  By stating that Uremovich may engage in any activities related to other industries,

the language suggests that the "refineries and petrochemical facilities" restriction was understood

to be industry-specific in addition to facility-specific.  If so, which industry(ies)?  Depending on

the facts, there may well be room for a fact-finder to construe this language to determine the

scope of the non-compete provision.  But even if the Agreement's language were entirely unambiguous, the question of whether Manhattan Mechanical Services or Great Lakes Energy (or Uremovich in his personal capacity) has provided services or products to a refinery or petrochemical facility is a factual question.

The court's only task at this juncture is to determine whether Cianbro's allegations state a facially plausible claim, *i.e.*, whether the allegations are enough to reasonably support an inference that the defendants provided services or products to a refinery or petrochemical facility.  Accepting the allegations as true, which is required at this stage, Cianbro states a plausible claim for breach of the non-competition provision of the Agreement because Cianbro alleges:  (1) that Manhattan Mechanical has provided services to Stepan Chemical, a manufacturer of, among other things, petroleum-based polymers;  (2) that Manhattan Mechanical holds itself out as providing services to ethanol plants and is actively marketing itself to petrochemical businesses;  and (3) that Uremovich has solicited business for Great Lakes Energy along similar lines.

According to Uremovich, the Agreement imposes no restriction at all on his ability to solicit future work or market the services of his LLCs, even if that activity is directed at refineries and petrochemical facilities.  (Motion to Dismiss at 4, 7-10.)  Even assuming that this is a correct interpretation of the Agreement because the non-competition covenant is drawn to bar the provision of "services and products," Cianbro's allegations related to marketing activity would still be sufficient to overcome a motion to dismiss.  If Uremovich is actively marketing his LLCs to supply services or products to refineries and petrochemical facilities even though he is prohibited from engaging or participating in such work, then it is plausible to infer that he has in fact secured or performed business at such refineries and facilities and Cianbro should have an

opportunity to conduct discovery into the issue.  A factual allegation stating that Uremovich has breached this provision is plausible and not merely conclusory in these circumstances.

Uremovich also contends that the scope of "refineries and petrochemical facilities" does not reasonably encompass "ethanol plants" (id. at 4, 12-13) or companies that manufacture "petroleum based polymers" or "oil field chemicals" (id. at 5).  This categorical approach is unavailing, as is Uremovich's assertion that he is free to perform work on "a pipeline" (id. at 12), because the Agreement quite plainly extends to plants or other facilities, such as pipelines, if they qualify as either refineries or petrochemical facilities.  That is a question of fact.  Even the allegations pertaining to Ingredion cannot be casually dismissed by the court giving the near ubiquity of petrochemicals in food products, not to mention the allegation that Ingredion is in the business of operating refineries.  A particular facility operated by Ingredion might qualify as a refinery or petrochemical facility.  This is not to say that every plant that uses petrochemicals in a manufacturing process is beyond Uremovich's reach, but it does require a determination of whether the services or products he supplies through his LLCs have been provided to refineries or petrochemical facilities.

Uremovich objects to what he characterizes as Cianbro's attempt to substitute a list of Starcon's customers in place of the "refineries and petrochemical facilities" restriction and he insists that many of the customer locations or premises identified in Cianbro's complaint are neither refineries nor petrochemical facilities.  (Id. at 10-11.)  Uremovich's objection is a fair objection.  The Agreement contains the refineries and petrochemical facilities language;  it does not include or incorporate a list of proscribed customers.  However, that is not to say that the parties' understanding and intention at the time of contracting necessarily have no relevance whatsoever.  It may prove difficult to determine whether a customer's particular facility amounts

13

to a refinery or petrochemical facility.  Extrinsic evidence related to the parties' mutual understandings and intentions could provide guidance for the resolution of such an issue, even though the Agreement includes an integration clause.  <u>See</u> Restatement (Second) Contracts § 212(2) (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on . . . a choice among reasonable inferences to be drawn from extrinsic evidence.").[2]

### 3.   *The non-disclosure provision*

The Agreement's non-disclosure provision is unambiguous.  It prohibits Uremovich from "publishing or making available" to "any person or entity" Starcon's confidential information. Confidential information is defined to mean "any information or material, . . . including . . . customer or supplier information, operational information, pricing information, or any information that may be generated or derived therefrom," but not including information in the public domain.  This provision is also informed by the Agreement's second whereas clause, which provides:  "WHEREAS, Seller has been actively engaged in [Starcon's] business and has had substantial contact with confidential information of the Company, including customer lists, proprietary business practices, marketing and pricing practices and the like . . ."  Unlike the

---

[2]      <u>See</u> <u>also</u> Restatement (Second) Contracts § 212 cmt. b ("It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. . . .  Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. . . .  But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.").

Maine law provides that where a final written contract expresses that the contract fully integrates the parties' understanding, "the contract must be construed independently of extrinsic evidence of any previously existing parole understanding not integrated into the writing" and the "use of such extrinsic evidence as an aid in construction for that purpose is impermissible."  <u>Portland Valve, Inc.</u>, 460 A.2d at 1388 n.5.  This rule precludes the use of extrinsic evidence to modify or vary the terms of the written agreement.  However, it does not preclude reliance on extrinsic evidence to interpret ambiguous language.  <u>Id.</u> at 1388.  The standards of contract construction establish a barrier to any attempt by Cianbro to turn the refinery/facility-specific language of the non-compete provision into a provision that gathers up all of Starcon's prior or prospective customers, but they do not necessarily bar all evidence concerning the parties' intentions.

14

facility-specific language of the non-competition provision, the language of the non-disclosure provision is customer-specific.

Uremovich argues that the complaint fails to state a claim for violation of this provision because it does not allege that he published or made available confidential information to a "third-party person or entity." (Motion to Dismiss at 13.) The question that leaps to mind, of course, is: what about Uremovich's own entities? According to Uremovich, the plain language of the Agreement permits him "to otherwise make use of [Starcon's confidential] information for his own benefit." (Id. at 13.) It is not apparent from a reading of the Agreement what language Uremovich has in mind. Uremovich's alleged use of confidential information to benefit entities he controls entails making that information available to a third party. Neither Manhattan Mechanical nor Great Lakes Energy is a signatory of the Agreement and, therefore, both qualify as third party entities with which confidential information must not be shared. Cianbro's allegations state a plausible claim because they include factual assertions that Uremovich has sought to solicit business from Starcon customers by using knowledge and information he gained in his former capacity as a principal of Starcon that would not otherwise be available to him. (Complaint ¶¶ 34, 37, 39, 42, 48, 62.) This use was for the benefit of third-party entities.

### 4.    Ancillary restraints on competition

This case potentially raises an issue concerning "ancillary restraints on competition." See Restatement (Second) of Contracts § 188. The rule prohibits unreasonable restraints on competition. Neither party argues that the restraint imposed on Uremovich is unreasonable if it precludes his competition with Starcon in relation to refineries and petrochemical facilities, but not other facilities and industries. Moreover, the parties appear to agree that the non-compete restriction cannot reasonably be construed to extend the term petrochemical to every product

containing a petroleum derivative, such as plastic toys, rubber tires, nylon pantyhose, and bowling balls.  (Motion to Dismiss at 13;  Cianbro's Memorandum in Opposition at 8, ECF No. 28.)  The rule against unreasonable restraints on competition is not likely to come to bear in this case, but it might depending on the kind of argument Cianbro presents in future proceedings. (See Defendants' Reply Memorandum at 7, ECF No. 30.)

## B.    Trade Secrets Claim

A claim under the Uniform Trade Secrets Act requires a showing of "misappropriation," 10 M.R.S. § 1542(2), of a "trade secret," id. § 1542(4).  Uremovich contends that Cianbro's complaint should be dismissed for being entirely conclusory in nature.  (Motion to Dismiss at 14-15.)  Uremovich does not dispute, however, that the confidential information described in the Agreement qualifies as a trade secret or that his disclosure or use of the confidential information qualifies as misappropriation.  For the reasons set forth in the preceding section, Cianbro has alleged a plausible claim for violation of the Trade Secrets Act.  The Act prohibits not only disclosure, but also use, when the person who discloses or uses the trade secret knows that it was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy."  10 M.R.S. § 1542(2)(B)(2)(ii).  The complaint sets forth sufficient factual allegations related to Uremovich's use of Starcon's customer information to state a plausible claim.

## C.    Tortious Interference

"Tortious interference with a prospective economic advantage requires a plaintiff to prove:  (1) that a valid contract or prospective economic advantage existed;  (2) that the defendant interfered with that contract or advantage through fraud or intimidation;  and (3) that such interference proximately caused damages."  Rutland v. Mullen, 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110.  Cianbro alleges that its contract and economic advantage derive from its

16

Agreement with Uremovich and that Uremovich's two LLCs, Manhattan Mechanical Services and Great Lakes Energy, interfered with Cianbro's rights under the Agreement by soliciting work from refineries and petrochemical facilities.  (Complaint ¶¶ 80, 82.)  Cianbro alleges that the LLCs made false representations to potential customers to the effect that the Agreement "did not preclude Uremovich from providing services to [them]" and that these customers relied on the representation to Cianbro's detriment by giving work to the LLCs rather than to Starcon.  (Id. ¶ 83.)  Cianbro alleges injury in the form of "unfair competition" and the loss of "the benefit of its bargain for the Starcon Shares."  (Id. ¶ 84.)

Cianbro's tortious interference claim is asserted exclusively against Manhattan Mechanical Services and Great Lakes Energy.  Cianbro elaborates in its opposition memorandum that the claim is based on the LLCs interference with Cianbro's contractual relationship with Uremovich, but that the economic disadvantage Cianbro suffers is in relation to its competitive position respecting potential customers.  (Cianbro's Memorandum in Opposition at 13-14.)  The defendants say that Cianbro fails to state a claim because there is no underlying breach of any contractual relationships and because there are no allegations describing intimidation.  (Motion to Dismiss at 15-16.)  For reason already indicated, the complaint does allege plausible claims for breach of contract against Uremovich.  Other than this, however, Cianbro fails to adequately allege facts that would justify expanding its breach of contract claims against Uremovich into tortious interference claim against Uremovich's two LLCs.

The question that arises here, in my view, is whether the tortious interference claim merges with the breach of contract claims.  The contract / prospective economic advantage that is before the court is the economic advantage Cianbro obtained by securing the Agreement from Uremovich.  Accepting the allegations as true, Manhattan Mechanical Services and Great Lakes

Energy could be the instruments of Uremovich's alleged breach, but they are not tortiously interfering with Cianbro's rights under the Agreement through fraud or intimidation.  Uremovich himself is in control of any alleged breach of the Agreement.  There is no independent action on the part of the LLCs that proximately caused Uremovich to breach the Agreement.  Nor can the LLCs be understood to have influenced or goaded Uremovich to breach the Agreement through acts of fraud or intimidation.  Although Cianbro alleges that Uremovich has made one or more false statements to a prospective customer, if Uremovich did speak falsely in a representation he made to a prospective customer and thereby actually procured work that would otherwise have gone to Starcon, the injury to *Cianbro* rests in Uremovich's failure to abide by the Agreement, which in the end is a breach of contract by Uremovich, not an act of "interference with the Agreement" through fraud or intimidation by Uremovich's LLCs.

## CONCLUSION

For the reasons set forth above, I recommend that the Court deny the defendants' motion to dismiss (ECF No. 26) with respect to counts I through IV, but grant the motion with respect to count V.  The defendants' motion for oral argument (ECF No. 31) is denied without prejudice to their ability to request oral argument in the context of any objection to this recommended decision.  The defendants' full response to the motion for preliminary injunction will be due 7 days following the court's final ruling on this motion, if the case or any portion thereof remains on the docket.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument

before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 28, 2013                    /s/ Margaret J. Kravchuk
                                    U.S. Magistrate Judge